**Dated: September 15, 2026**

**The following is ORDERED:**

PAUL R. THOMAS
UNITED STATES BANKRUPTCY JUDGE

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **IN RE:**<br><br>**DEBORAH JEAN DEIBERT,**<br><br>**Debtor.** | **Case No. 24-10239-T**<br>**Chapter 7** |
| **CLINTON VEIT AND BARBETTE VEIT,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DEBORAH JEAN DEIBERT,**<br><br>**Defendant.** | **Adv. No. 24-01012-T** |

**MEMORANDUM OPINION**

This case arises out of a dispute between neighbors over the construction of a two-story garage structure. Amid contentious litigation in state court regarding compliance with neighborhood plat restrictions, the party responsible for erecting the structure, the defendant in the state court litigation, filed a petition for bankruptcy under chapter 7 of the United States

Bankruptcy Code. The plaintiffs in the state court litigation cried foul and commenced this adversary proceeding seeking to deny the debtor a discharge under 11 U.S.C. § 727(a)(2)(A) and 727(a)(4),[1] and objecting to the discharge of their debt under § 523(a)(6). The following "Findings of Fact" and "Conclusions of Law" are made pursuant to Federal Rule of Civil Procedure 52, which is made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). Matters related to the denial of a discharge and dischargeability of a particular debt are core proceedings as defined by 28 U.S.C. § 157(b)(2)(I) and (J).

## Findings of Fact

Deborah Jean Deibert ("Defendant") purchased a home in the Wilson View Second Addition to the City of Tulsa, Oklahoma ("Defendant's Property") in 2020. The deed to Defendant's Property describes it as:

> Lot Five (5), Block One (1), Wilson View Second Addition to the City of Tulsa, Tulsa County, State of Oklahoma, according to the recorded Plat thereof.[2]

Despite the reference to a "Plat" in the deed, Defendant testified that she was unaware of any plat, restrictions, or other covenants related to Defendant's Property at the time she purchased it.

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[2] Plaintiffs' Ex. 3.

***The Structure***

Clinton and Barbette Veit ("Plaintiffs" or the "Veits") are neighbors that own property adjoining Defendant's Property. In 2021, after observing multiple homes in her neighborhood with additional outbuildings, Defendant made the decision to construct a detached garage with a second story guest room in her backyard (the "Structure"). While the project was still in the conceptual phase, Defendant discussed her plans with Mr. Veit and received no negative feedback.

In spring of 2022, Defendant contacted a designer to draw up sketches and plans for the Structure. In May 2022, Defendant applied for a Special Exception to the City of Tulsa Zoning Code to build the Structure, referred to as an Accessory Dwelling Unit, on her property. Notice of a meeting on the application with the City of Tulsa Board of Adjustment (the "BOA"), together with copies of the design plans, were sent to all affected neighbors in the Wilson View Second Addition, including Plaintiffs. Prior to the BOA meeting, Defendant became aware that Plaintiffs had concerns about the Structure. Defendant met with Plaintiffs and listened to their concerns. She asked her designer to revise the plans to address several of Plaintiffs' concerns, such as moving the Structure further from the fence line of Plaintiffs' property, using opaque glass in windows facing Plaintiffs' property, and reducing the size of the second story. Defendant provided the revised plans to Plaintiffs and offered to arrange a meeting with her designer if they desired. Plaintiffs declined the offer and expressed no dissatisfaction with the new design. When asked if Plaintiffs were happy with Defendant's revised plans for the Structure, Mrs. Veit answered "Sure."

In June 2022, the BOA held a meeting regarding Defendant's application. Several of Defendant's neighbors spoke at the meeting in opposition to the application. Although Plaintiffs attended the BOA meeting, they did not speak or otherwise register their opposition to the

application or dissatisfaction with the project. At the conclusion of the meeting, the BOA unanimously approved Defendant's application.

After receiving the required permits, construction on the Structure began in October 2022. Defendant hired Charles Rick ("Mr. Rick") as her general contractor for the project. Construction continued apace until November 28, 2022. On that date, Defendant received a letter (the "Hollaway Letter") from attorney Blair Hollaway ("Mr. Hollaway") of Blair Law.[3] The Hollaway Letter declared that the Structure violated recorded restrictions governing Wilson View Second Addition, but did not otherwise reference a specific plat or give any details regarding the alleged violation. Nor did it identify Mr. Hollaway's clients. The Hollaway Letter made demand that Defendant take steps to remove the Structure within 10 days or Mr. Hollaway would initiate legal proceedings and seek monetary damages.

Defendant immediately engaged counsel, who located a 1940 deed of dedication for the Wilson View Second Addition (the "Plat"), which contained various restrictions and covenants.[4] Her counsel timely responded to the Hollaway Letter, indicating their belief that the Structure was not in violation of the Plat. Defendant also contacted Mr. Rick and asked him to 1) strictly adhere to the specifications approved by the BOA; and 2) make the Structure his priority in order to finish the project as quickly as possible and prevent further disruption to her neighbors.

***The State Court Litigation***

On December 12, 2022, Plaintiffs, represented by Mr. Hollaway, filed a nuisance complaint and an action to enforce restrictive covenants against Defendant in the District Court of Tulsa County, Oklahoma (the "State Court"), Case No. CJ-2022-3750 (the "State Court Litigation").[5]

---

[3] ECF No. 30-1, at 24.
[4] Plaintiffs' Ex. 2.
[5] ECF No. 30, at 8 ¶ 21.

On January 19, 2023, the State Court entered an ex parte temporary restraining order ("TRO").[6] The TRO enjoined Defendant and her agents from "performing any further construction on" the Structure, including "the installation of any electrical or plumbing fixtures or materials in or on" the Structure, and from "allowing any person . . . to occupy" the Structure.[7] Upon learning of the TRO, Defendant contacted her counsel and immediately asked Mr. Rick to inform his crew to stop all work on the Structure. Notwithstanding the language of the TRO, Defendant allowed Mr. Rick to take steps to secure the lot and the Structure, by filling in an open trench, adding a seal to the previously installed garage door so that it could be closed, and making necessary repairs to an existing entryway door that would allow it to be locked. Mr. Rick testified to the necessity of these actions to secure materials and tools being stored inside the Structure, as well as to leave the exterior of the worksite in a safe condition.

On the day the TRO was received by Defendant, Mr. Rick's crew was in the middle of connecting electrical service to the Structure. Without Defendant's or Mr. Rick's knowledge or authorization, a member of Mr. Rick's crew returned to the job site and installed a meter box and power head to complete the electrical work. In addition, when the TRO was issued and construction on the Structure halted, electricity was being provided to Defendant's home by way of temporary electrical posts. Mr. Rick informed Defendant that the temporary connections were unsafe and posed a danger to her health and safety. Defendant made application to the State Court to amend the TRO to allow her to replace the temporary connections with a permanent electrical attachment to her home (the "First Application").[8]

[6] Defendant's Ex. 117.
[7] *Id*. at 2.
[8] Defendant's Ex. 119.

On July 3, 2023, the State Court entered a temporary injunction (the "Temporary Injunction").[9] The Temporary Injunction enjoined Defendant or her agents from "performing any further construction" on the Structure, and from "allowing any person to occupy" the Structure. The presiding State Court judge added handwritten language to the Temporary Injunction, granting the First Application, and allowing Defendant "to perform permanent electrical re-connection to her home."[10] Upon receipt of the Temporary Injunction, Mr. Rick took steps to install an electrical box to replace the temporary connections and run permanent connections to Defendant's home.

On July 7, 2023, Defendant filed a second application to amend the TRO (the "Second Application"). For reasons that are unknown, a document containing a file stamp of the State Court clerk and a stamp indicating the signature of the presiding State Court judge was filed in the State Court on August 10, 2023 (the "Erroneous Order").[11] Nothing on the face of the Erroneous Order suggests that it was not a legitimate order of the State Court filed in the State Court Litigation. The Erroneous Order purported to grant the Second Application. It also went further and allowed Defendant to complete construction on the downstairs portion of the Structure. The Erroneous Order also stated that Defendant "shall not have permission to conduct construction to benefit the second story dwelling area." Defendant found out about the Erroneous Order on September 6, 2023.[12] She was not aware at that time that it was anything other than a valid order of the State Court. Relying on the apparent authority granted in the Erroneous Order, Defendant contacted Mr.

[9] ECF No. 25-2 (attachment to Amended Complaint); ECF No. 30-1, at 43 (attachment to Declaration of Deborah Deibert in Support of Motion for Summary Judgment). The Temporary Injunction was discussed at the Trial, but not offered as an exhibit by any party. It was attached to pleadings filed by both parties at various points in the litigation of this matter. Therefore, the Court will take judicial notice of its contents.

[10] ECF No. 25-2, at 2.

[11] Defendant's Ex. 122.

[12] Plaintiffs' Ex. 27, at 11.

Rick and informed him that work could resume on the downstairs garage portion of the Structure. Soon after, Mr. Rick and his crew arrived and began to perform additional work on the Structure, being careful to limit their work to the lower level of the Structure. On or about October 10, 2023, Defendant was informed that the Erroneous Order had been entered in error and had not been sanctioned by the State Court judge. Defendant immediately instructed Mr. Rick to cease all work on the Structure, which he did.

On December 27, 2023, upon further application of Defendant, the State Court issued an Order of Modification of the Temporary Injunction (the "Modification Order").[13] The Modification Order states, in part:

> The court has already determined on July 3, 2023 the temporary injunction shall allow the Defendant to install a new meter can on rear of new building and connect power from utility pole in easement, connect to main house via underground conduit to the service panel in the garage. Upon Defendant's affidavit filed August 10, 2023 the court further orders the temporary injunction shall be modified "to allow Defendant to complete construction of the single car garage/storage portion of the Structure upon Defendant's property. Defendant **shall not** have permission to conduct construction to benefit the second story dwelling area."[14]

After receipt of the Modification Order, Defendant instructed Mr. Rick to complete work on the lower level of the Structure, with strict instructions to refrain from any work that would "benefit" the second story.

Plaintiffs allege that after the entry of the TRO and Temporary Injunction, Defendant or her agents continued to perform work that benefited the second story of the Structure. Both Plaintiffs testified generally that they saw and heard activity in the Structure, including movement of people and materials, during times when they believed the State Court had enjoined further construction. Both Plaintiffs acknowledged that the windows facing their property were covered

[13] Defendant's Ex. 126.
[14] *Id.*

or contained opaque glass, and they could not actually see any work or activity taking place. They were unable to provide any specifics regarding when the alleged activity took place, or where exactly within the Defendant's Property the activity was taking place. The Court found Plaintiffs' testimony regarding such activity to be heavy on emotion, but light on detail. Defendant credibly testified that her home includes an attached garage that her domestic partner used for unrelated woodworking projects during this period. Those projects could easily explain some of the "construction noises" Plaintiffs claim to have heard during periods when construction on the Structure had been enjoined. Likewise, once construction was allowed to resume on the lower level of the Structure, the observation of personnel and materials on Defendant's Property would be expected.

Plaintiffs allege that sometime after the TRO was issued, two pipes were installed that protruded through the floor of the second story of the Structure by approximately 24 inches. They allege that this constitutes an egregious violation of the State Court orders which specifically restricted all construction that would "benefit" the second story. Mr. Rick testified regarding the installation of the pipes. He stated that normally, plumbing was installed "from the top down" to ensure the pipes and drains are properly aligned. When Mr. Rick's contractors were installing plumbing to finish the lower level of the Structure, they were careful to ensure that the drains and pipes lined up with the previously drilled holes in the floor of the upper story. While they took no actions to "benefit" the upper level or to install any plumbing fixtures, they placed empty pipes in the existing holes as placeholders to ensure the lower level plumbing was properly installed.

***The Financing***

Defendant is an educator at a local community college. She lives with a domestic partner who contributes to Defendant's household expenses. Mr. Rick charged Defendant a total of

$75,380 in construction costs related to the Structure. Defendant financed the Structure through her savings and several loans. In November 2021, Defendant received $98,026.46 by refinancing her existing home mortgage. In August 2022, she took an unsecured loan of $40,000.00 from USAA. These funds were used as follows: $38,135 to renovate the existing garage and install a fence on Defendant's Property; $1,960 to pay the designer of the Structure; $733 for permits related to the Structure; and $61,865 to pay Mr. Rick for construction of the Structure. Each of these expenses were incurred prior to Defendant's receipt of the Hollaway Letter.

After the initiation of the State Court Litigation, Defendant made early withdrawals totaling $37,000 from an IRA, which generated $3,671.45 in adviser fees and $15,228 in taxes and penalties to the IRS. The IRA funds were primarily used to pay her attorney's fees related to the State Court Litigation. She also borrowed $19,356 from her 403(b) Plan, and later borrowed $40,000 from American Express. These funds were used to pay attorney's fees and living expenses.

In total, Defendant paid $57,886.87 in litigation-related attorney's fees for defense of the State Court Litigation, $39,156.63 of which was paid within one year of filing her underlying bankruptcy case, and $5,401.50 of which remained unpaid. In addition, Defendant paid Mr. Rick and other contractors $20,272.74 for construction of the Structure within one year of filing this bankruptcy case.

***The Bankruptcy Case***

Beginning around October 2023, Defendant began struggling to keep up with the mounting legal bills related to the State Court Litigation. She testified that her counsel in the State Court Litigation informed her of her rights and options regarding seeking a discharge in bankruptcy, but she did not consider that to be an acceptable path forward. At the time, she believed she would be

able to cover the continuing legal bills and repayment of her remaining debts from her salary. After attending a mediation with Plaintiffs in January 2024 and learning of the magnitude of Plaintiffs' contingent claims for attorney's fees, Defendant came to the realization that settlement would be impossible and filing bankruptcy must be considered.

On March 11, 2024 (the "Petition Date"), Defendant filed her voluntary bankruptcy petition under chapter 7, Case No. 24-10239-T, with the assistance of counsel. In response to a question on the petition regarding the nature of her debts, Defendant indicated that her debts are not primarily consumer debts, but they are primarily business debts.[15] Among her unsecured debts, Defendant listed two debts to American Express: 1) for $39,013.05, described as "loan for legal expenses as a result of pending litigation;" and 2) for $14,746.38, described as "used card to pay legal expenses as a result of pending litigation."[16] In addition to listing Plaintiffs as unsecured creditors, Defendant listed each of her neighbors in the Wilson View Second Addition that may have had a contingent claim regarding the alleged Plat violations, with a notation that she disputes such claims. Both Plaintiffs and Defendant have characterized the debt to Plaintiffs as a contingent claim for damages and for attorney's fees under title 60, section 856 of the Oklahoma Statutes, which allows a prevailing party in any action to enforce a property restriction or covenant to recover reasonable attorney's fees.[17]

In response to an inquiry from the United States Trustee regarding the characterization of her debts as primarily non-consumer in nature, Defendant compiled a table listing each of her scheduled debts, including: the name of the creditor, the location of the debt in her schedules, the

[15] Case No. 24-10239, ECF No. 1, at 6; Fed. Rule Bankr. Proc. Official Form 101, Question 16.

[16] Case No. 24-10239, ECF No. 1, at 24 ¶¶ 4.2 & 4.3.

[17] Amended Complaint, ECF No. 25, at 2-3 ¶ 9.

amount of the debt (with estimates provided if a debt had been scheduled with an "unknown" value), characterization of the debt as consumer or non-consumer, and an explanation of that characterization (the "Debt Analysis").[18] The Debt Analysis indicates Defendant has consumer debts of $318,707, which includes the mortgage on her home, a loan from a 403(b) account for remodeling, unsecured debts to Capital One and Chase for living expenses, and an unsecured debt to USAA for remodeling. The Debt Analysis indicates Defendant has non-consumer debts of $590,859, which includes tax debt, debt to American Express for litigation costs, debt for damages to Plaintiffs in the State Court Litigation and other potential claimants for Plat violations, and claims for attorney's fees related to the State Court Litigation. Plaintiffs did not provide any independent analysis regarding the characterization of Defendant's debt.

On June 10, 2024, Plaintiffs filed the instant adversary proceeding. The original Complaint sought denial of Defendant's discharge pursuant to § 727(a)(2) and an objection to Defendant's discharge of Plaintiffs' debt pursuant to § 523(a)(6). On December 9, 2024, Plaintiffs filed an Amended Complaint. The Amended Complaint added claims under § 727(a)(3) and (a)(4), and substantially amended the claim under § 523(a)(6).[19] Plaintiffs have since stated they are no longer pursuing a claim under § 727(a)(3). The claim under § 523(a)(6) in the Amended Complaint specifically refers to Defendant's actions in relation to an injunction issued by the State Court.[20] On May 30, 2025, this Court issued a bench ruling related to an emergency motion filed by Plaintiffs to extend discovery and cross motions for summary judgment filed by each party. In denying both parties summary judgment on the § 523(a)(6) claim, the Court described it as follows:

---

[18] Defendant's Ex. 128.

[19] ECF No. 25, at 8-9.

[20] *Id.* at 8 ¶ 40 ("Defendant intentionally violated the injunction set by Tulsa County District Court to protect the Veits' legal rights."); ¶ 41 ("Defendant intentionally and maliciously violated the rights Veits' legal rights." [sic]).

"The crux of plaintiffs' claim under 523(a)(6) is that defendant intentionally and maliciously violated the temporary injunction entered by the state court prior to the petition date."[21] In preparation for the trial in this matter, the parties drafted a jointly prepared pre-trial order (the "Amended Joint Pre-Trial Order").[22] That Order indicates that, among other things, "Plaintiffs bring their Complaint: . . . for a determination their debt is nondischargeable under 11 U.S.C. § 523(a)(6) for willful and malicious injuries *due to Defendant violating a temporary restraining order and/or a temporary injunction*[.]"[23]

On July 27, 2026, a trial was held in this proceeding (the "Trial"). The Court received evidence and heard testimony from both of the Plaintiffs, Defendant, Mr. Rick, and a court reporter regarding a discrepancy in a state court transcript.[24] At the conclusion of the Trial, the Court took the matter under advisement.

To the extent the "Conclusions of Law" contain items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

**Burden of Proof**

The burden of proof in a case under § 523 or § 727 is always upon the objecting party.[25] In order to prevail, plaintiffs must prove each statutory element by a preponderance of the evidence.[26] Once the plaintiff has met its burden of presenting prima facie evidence going to each of the elements of its case, the burden shifts to the debtor to provide a cogent explanation for its

[21] ECF No. 68, Transcript of proceedings held on May 30, 2025, at 10.

[22] ECF No. 74.

[23] *Id*. at 1 ¶ 4 (emphasis added).

[24] The Court found the testimony surrounding the transcript discrepancy to be a tempest in a teapot. Plaintiffs were apparently trying to establish a fact by "admission" that Defendant has already openly admitted, which is that after receipt of the TRO, she allowed Mr. Rick to secure the worksite surrounding the Structure.

[25] Fed. R. Bankr. P. 4005.

[26] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997).

actions.[27] In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[28] Denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor.[29] Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[30]

**Conclusions of Law**

In this adversary proceeding, Plaintiffs are seeking:

1. denial of Defendant's discharge under § 727(a)(2)(A) for transferring non-exempt assets to exempt assets with the actual intent to hinder, delay or defraud the Plaintiffs;
2. denial of Defendant's discharge under § 727(a)(4)(A) for making a false oath in her bankruptcy petition that her debts were not primarily consumer in nature; and
3. a determination that Plaintiffs' debt is nondischargeable under § 523(a)(6) for willful and malicious injuries caused by Defendant's violation of the TRO and/or Temporary Injunction.[31]

The Court will address each in turn.

***Section 727(a)(2)(A)***

Section 727(a)(2)(A) of the Code provides that a discharge may be denied where

> the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition[.]

---

[27] *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 242 (Bankr. D. Colo. 2005).
[28] *In re Brown*, 108 F.3d at 1292.
[29] *Sierra Chemicals, LLC v. Mosley (In re Mosley)*, 501 B.R. 736 (Bankr. D.N.M. 2013).
[30] *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).
[31] ECF No. 74 (Amended Joint Pre-Trial Order), at 1-2.

This exception to discharge consists of two critical pieces: 1) an act, i.e, a transfer or a concealment, involving property of the debtor; and 2) a subjective intent to hinder, delay, or defraud a creditor.[32] Both the act and the intent must be present during the year before the petition date. "Anything occurring before that one-year period is forgiven."[33]

A party objecting under this section must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the debtor or estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.[34] A majority of courts treat the phrase "hinder, delay or defraud" in the disjunctive, meaning any of the three may qualify under the statute.[35] When determining whether a transfer was made with the intent to hinder, delay, or defraud creditors, courts must look for "*actual* intent to defraud creditors."[36] It is not enough to show that a transfer resulted in harm to creditors; under § 727(a)(2)(A), a creditor must show that a debtor possessed an unlawful, fraudulent intent, as where a debtor attempts to prejudice the legal or equitable rights of creditors, or to take advantage of a transfer to personally benefit at the expense of creditors.[37]

"'[T]he desire to convert assets into exempt forms by itself' does not constitute actual intent to defraud, . . .;'extrinsic evidence of fraudulent intent is required to establish fraud.'"[38] A debtor's

---

[32] *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993).

[33] *Id.*

[34] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (citing *In re Brown*, 108 F.3d at 1292).

[35] *In re Karpuleon*, No. 24-80647, 2024 WL 5011412 (Bankr. C.D. Ill. Dec. 6, 2024) (recognizing majority).

[36] *In re Warren*, 512 F.3d at 1249 (quoting *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991). *See also In re Stratton*, 23 B.R. 284, 288 (D.S.D. 1982) ("The language 'actual intent to hinder, delay, or defraud' must be interpreted consistently to mean that the hinderance or delay is fraudulent.") (citing *Coder v. Arts*, 213 U.S. 223 (1909)).

[37] *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002); *In re Stratton*, 23 B.R. at 288; *In re Karpuleon*, 2024 WL 5011412, at *6.

[38] *In re Carey*, 938 F.2d at 1077 (quoting *In re Johnson*, 880 F.2d 78, 81 (8th Cir.1989)).

subjective intent is "measured at the time of disposition of the non-exempt property."[39] Proof of a debtor's intent may be proven by circumstantial evidence including inferences based on a debtor's course of conduct.[40] Because a debtor seldom readily admits to his or her own subjective fraudulent intent, courts often consider "badges of fraud" that serve as indicia of the improper intent required by § 727(a)(2). Among the badges of fraud often considered by courts in the Tenth Circuit are:

(1) lack or inadequacy of consideration for transfer;

(2) existence of a family, friendship, or special relationship between parties;

(3) attempt by debtor to keep transfer secret;

(4) financial condition of the party sought to be charged both before and after transaction;

(5) existence or cumulative effect of pattern or series of transactions or course of conduct after incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) overall chronology of events and transactions.[41]

Cases involving fraudulent intent "are peculiarly fact specific, and the activity in each situation must be viewed individually."[42] Critically, review of the badges is not a math problem: "[C]ourts

---

[39] 4 Collier on Bankruptcy ¶ 522.08 (16th ed. 2025). *See also In re Enloe*, 542 B.R. 414, 428 (Bankr. S.D. Tex. 2015) ("The operative date is not [debtor]'s state of mind as of the petition date, but rather his state of mind when he made the transfers." (citing *Cipolla v. Roberts (In re Cipolla)*, 476 F. App'x 301, 306 (5th Cir. 2012))).

[40] *In re Warren*, 512 F.3d at 1249 ("Fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct." (quoting *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982))); *In re Brown*, 108 F.3d at 1293-94; *In re Carey*, 938 F.2d at 1077; *Parks v. Anderson*, 406 B.R. 79, 96-97 (D. Kan. 2009).

[41] *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 916-17 (Bankr. D. Utah 2006) (internal citations and footnotes omitted).

[42] *In re Carey*, 938 F.2d at 1077.

look to whether the aggregate of facts demonstrates an inference of fraud rather than requiring the plaintiff to show a majority or any specific number of the badges."[43] A "pattern of wrongful behavior" may indicate wrongful intent sufficient to deny discharge under § 727(a)(2).[44]

***Application***

It is well settled law that conversion of non-exempt assets into exempt assets can constitute a transfer under § 727(a)(2).[45] In this case, Defendant admits that within the one year prior to the Petition Date, she paid $39,156.63 in attorney's fees to her counsel in the State Court Litigation, and made payments totaling $20,272.74 to various contractors related to the Structure. Although she takes the position that some of the expended funds, particularly from the refinance of her mortgage and from retirement funds, were exempt prior to their withdrawal, Defendant does not dispute that the funds were non-exempt after they were transferred to her checking account prior to being transferred to contractors or attorneys. The first three elements of the test under § 727(a)(2)(A) are thereby established, leaving only the fourth element for resolution: whether the transfers to contractors and attorneys were made with the actual intent to hinder, delay, or defraud the Plaintiffs.

First, Plaintiffs object to the continued payment of contractors after Defendant became aware of their claims in the State Court Litigation. Plaintiffs believe that once Defendant became aware of their claims regarding the Plat restrictions, she should have admitted defeat, ceased all further construction activity, and started saving her pennies for the obvious bill for their attorney's fees that would soon be forthcoming. Anything less, they posit, is a violation of § 727(a)(2)(A).

[43] *Horizon Fin. Bank v. Borstad (In re Borstad)*, 550 B.R. 803, 830 (Bankr. D.N.D. 2016) (citing *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008)).

[44] *In re Butler*, 377 B.R. at 916.

[45] *In re Warren*, 512 F.3d at 1249; *In re Carey*, 938 F.2d at 1077.

Instead, after the State Court entered the Modification Order allowing continued construction of the lower level of the Structure, Defendant employed Mr. Rick and other contractors to complete that job. Plaintiffs allege this transfer of non-exempt funds into Defendant's exempt homestead was calculated to shield those assets from their collection efforts. Defendant refutes this allegation and argues that she took pains to comply with all State Court Orders, and that she felt obligated to pay the bills of her contractors as they were presented, in order to prevent the placement of materialman's liens on her homestead.

Second, Plaintiffs fault Defendant for presenting *any* defense in the State Court Litigation. Plaintiffs equate Defendant's presentation of a defense to their claims, including hiring and paying counsel to represent her in that action, as a fraudulent effort to deprive them of assets that *should* have been used to eventually pay their claims. Defendant takes the position that the Structure, as currently constructed, does not violate the Plat covenants that are the subject of the State Court Litigation. Defendant testified that her intention in paying ongoing attorney's fees to her counsel in the State Court Litigation was to keep them working on her case. While the Court does not take a position regarding the outcome of the State Court Litigation, it does not find Defendant's position in that action to be blatantly frivolous.

Beyond accusing Defendant of making the challenged transfers, Plaintiffs have presented no "extrinsic evidence" to show that the transfers were made with any fraudulent or unlawful intent. Plaintiffs did not present an analysis of the badges of fraud commonly applied in this circuit, and the Court is unable to identify any badges that would warrant denial of Defendant's discharge.

Defendant has been completely transparent about her use of funds in financing the Structure and her engagement of counsel in the State Court Litigation. Defendant took no action to hide or conceal her efforts to complete the lower level of the Structure, or to pay her contractors

for doing so. There is no evidence that Mr. Rick, other contractors, or her State Court counsel are insiders, or that the transfers to them were gratuitous. Although the transfers happened within one year of the Petition Date, there was no evidence that Defendant purposely manipulated the timing of payments to either the contractors or her counsel in order to deprive other creditors of those funds. To the contrary, Defendant testified that she paid her bills in the ordinary course as they came due. While Defendant was aware of the pendency of the State Court Litigation, the outcome of that lawsuit, and therefore the resolution of Plaintiffs' claims, was far from certain in the year prior to the Petition Date. Looking at the evidence as a whole, the Court cannot find Plaintiffs have met their burden of proof to show that any transfers were made fraudulently, or that Defendant intended to hinder, delay, or defraud Plaintiffs (or any creditor) under § 727(a)(2)(A).

***Section 727(a)(4)(A)***

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]" Black's Law Dictionary equates the term "false oath" with the term "perjury," which it defines as:

> The act or an instance of a person's deliberately making material false or misleading statements while under oath; esp., the willful utterance of untruthful testimony under oath or affirmation, before a competent tribunal, on a point material to the adjudication. — Also termed *false swearing*; *false oath*; *falsehood*; (archaically) *forswearing*.[46]

[46] Perjury, Black's Law Dictionary (12th ed. 2024); False Oath, Black's Law Dictionary (12th ed. 2024).

"The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations."[47] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[48]

The test applied under § 727(a)(4)(A) has been distilled to the following elements: (1) that the debtor made a false statement under oath; (2) that the debtor knew the statement was false; (3) that the debtor made the statement with fraudulent intent; and (4) that the statement was material.[49] Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[50] The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it

[47] *Davis v. Weddington (In re Weddington)*, 457 B.R. 102, 113 (Bankr. D. Kan. 2011) (citations omitted).

[48] *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

[49] *In re Mosley*, 501 B.R. at 742 (citing *Rajala v. Majors (In re Majors),* No. KS-04-93, 2005 WL 2077497, at *3 (10th Cir. BAP Aug. 29, 2005)). *See also In re Brown*, 108 F.3d at 1294 ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact."); *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) ("In order to be denied a discharge under [§ 727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. . . . The false oath made by the debtor must have related to a material matter." (citations omitted)).

[50] *Williamson*, 828 F.2d at 251.

bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of estate property.[51]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[52] Likewise, a debtor's false statement regarding the nature of her debts, if made to avoid application of the means test under § 707(b), can be grounds for denial of discharge under § 727(a)(4)(A) if the false statement is made knowingly and fraudulently and is material to the bankruptcy case.[53] The United States Court of Appeals for the Tenth Circuit has noted that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[54] We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[55]

There is no dispute that Defendant's responses in the Petition regarding the nature of her debts were statements made under oath.[56] The threshold issue before the Court is whether Defendant's characterization of her debts as not primarily consumer debts constitutes a false oath.[57] The Bankruptcy Code defines a "consumer debt" as a "debt incurred by an individual

---

[51] *UST v. Garland (In re Garland)*, 417 B.R. 805, 814 (10th Cir. BAP 2009); *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

[52] *See In re Calder*, 907 F.2d at 955; *Woolman v. Wallace (In re Wallace)*, 289 B.R. 428, 434 (Bankr. N.D. Okla. 2003).

[53] *Fraleigh v. Fraleigh (In re Fraleigh)*, 474 B.R. 96, 105 (Bankr. S.D.N.Y. 2012) ("Statements made on the means test and schedules are made 'under oath' for purposes of section 727(a)(4).") (citing *Bernhardt v. Radloff (In re Radloff)*, 418 B.R. 316 (Bankr. D. Minn. 2009)).

[54] *In re Brown*, 108 F.3d at 1294.

[55] *Id.* at 1295.

[56] Case No. 24-10239, ECF No. 1, at 6 (debtor's signature under penalty of perjury that information provided in the Petition is true and correct). *See also In re Fraleigh*, 474 B.R. at 105; *In re Radloff,* 418 B.R. at 321-22.

[57] *See* ECF No. 74, at 1-2 (Plaintiffs bring their Complaint . . . for a denial of Defendant's discharge under 11 U.S.C. § 727(a)(4)(A) for making a false oath in her bankruptcy petition that her debts were not primarily consumer in nature.").

primarily for a personal, family, or household purpose."[58] Numerous Code sections refer to the term consumer debt.[59] "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."[60] Therefore, to determine the meaning of consumer debt for the purposes of applying § 101(8), the Court may look to the use or interpretation of the term consumer debt in other contexts within the Code.[61]

Courts generally construe the term consumer debt narrowly.[62] When determining whether a debt is a consumer debt, courts usually examine the purpose for which the debt was incurred.[63] Courts in this circuit have found debt incurred for a business venture or with a profit-motive is not consumer debt because it is not "debt incurred by an individual primarily for a personal, family, or household purpose."[64] But debt need not be classified as business debt to fall outside the definition of consumer debt.[65] As this Court has noted, "Congress did not define 'consumer debt'

---

[58] § 101(8).

[59] *See, e.g.*, § 524(c)(6)(B) (excepting consumer debts secured by real estate from reaffirmation requirements); § 707(b)(1) (providing for dismissal of chapter 7 cases filed by individual debtors "whose debts are primarily consumer debts" for substantial abuse); § 523(d) (requiring court to award attorney's fees to a debtor if, without a basis that is "substantially justified," a creditor "requests a determination of dischargeability of a consumer debt under [§ 523(a)(2)]").

[60] *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *In re Runski*, 102 F.3d 744, 746 (4th Cir. 1996).

[61] *See In re Sijan*, 611 B.R. 850, 855 (Bankr. S.D. Ohio 2020); *In re Álvarez Vélez*, 617 B.R. 158, 169 n.6 (1st Cir. BAP 2020).

[62] *In re Álvarez Vélez*, 617 B.R. at 169–70; *In re Sijan*, 611 B.R. at 855; *In re White*, 49 B.R. 869, 872 (Bankr. W.D.N.C. 1985).

[63] *In re Álvarez Vélez*, 617 B.R. at 170; *Palmer v. Laying*, 559 B.R. 746, 750 (D. Colo. 2016) ("the primary purpose for which the debt was incurred must be determinative.").

[64] *In re Stewart*, 175 F.3d 796, 806 (10th Cir. 1999) ("'Consumer debt' is further distinguished from 'non-consumer' debt as a debt incurred with a 'profit motive.'") (citing *Citizens Nat'l Bank v. Burns (In re Burns)*, 894 F.2d 361, 363 (10th Cir. 1990)).

[65] *In re Westberry*, 215 F.3d 589, 593 (6th Cir. 2000) ("Therefore, while the profit motive analysis may assist in the determination of which debts are not consumer debt, it does not prohibit other debts from falling outside of the category of consumer debt."); *In re Álvarez Vélez*, 617 B.R. at 170; *In re Marshalek*, 158 B.R. 704, 708 (Bankr. N.D. Ohio 1993) ("An inability to classify a particular debt as a business debt does not automatically relegate it to the status of a consumer

as a 'debt incurred by an individual having no profit motive,' but rather as a 'debt incurred by an individual for a personal, family or household purpose'."[66]

When determining whether a non-business debt is a consumer debt, courts often consider whether the individual voluntarily intended to incur the debt for a personal, family, or household purpose. Implicit in the Code's definition of consumer debt is the element of *volition*.[67] That is, the subject indebtedness must necessarily be voluntarily "incurred" by the debtor for the purposes specified in § 101(8).[68] As one court explained, "a consumer debt is one that is 'incurred'—implying that some voluntary action is taken before a consumer becomes liable on the debt."[69] While the action leading to the liability may have been intentional, if the debtor did not

---

debt." (citing *In re White*, 49 B.R. at 869)); *In re Brashers*, 216 B.R. 59 (Bankr. N.D. Okla. 1998) (finding tax liability is not "incurred" as part of consumption activity, but is involuntarily imposed in the course of earning income).; *In re Peterson*, 524 B.R. 808, 812–13 (Bankr. S.D. Ind. 2015) ("The mere fact that the Judgment is not a 'business' debt does not mean it *per se* fits the definition of a 'consumer' debt. . . . A 'consumer debt' is only a subset of 'non business debt'"); *In re Stewart*, 201 B.R. 996, 1004–05 (Bankr. N.D. Okla. 1996) ("Profit motive is relevant but not necessarily decisive, for several reasons."), *aff'd*, 215 B.R. 456 (10th Cir. BAP 1997), *aff'd*, 175 F.3d 796 (10th Cir. 1999).

[66] *In re Stewart*, 201 B.R. at 1005.

[67] *In re Marshalek*, 158 B.R. at 707; *In re Álvarez Vélez*, 617 B.R. at 170; *In re Westberry*, 215 F.3d at 591; *In re Stewart*, 201 B.R. at 1004 ("The term 'consumer debt' as used in § 707(b) serves to direct the Court's attention to a type of bankruptcy case which is especially liable to abuse and especially deserving of review. That type of case involves an individual debtor who voluntarily (in the sense of 'on his initiative, at his option') takes advantage of modern easy-credit practices to accumulate debts, for the immediate purpose of satisfying his private appetites and maintaining or enhancing his personal qualities and lifestyle, or those of his dependents—often in circumstances which offer creditors little security, because the benefits acquired by the debts are used up ('consumed') by the debtor himself and assimilated to his person—and who effectively avoids repayment by keeping his unconsumed property and his income from wages or professional earnings to himself and from his creditors, despite even bankruptcy, e.g. pursuant to 11 U.S.C. §§ 522(b), 524(a)(2), 541(a)(6).").

[68] *In re Marshalek*, 158 B.R. at 707; *In re Álvarez Vélez*, 617 B.R. at 170; *In re Westberry*, 215 F.3d at 591 ("incurrence" of tax debt not voluntary).

[69] *In re Stovall*, 209 B.R. 849, 854 (Bankr. E.D. Va. 1997) ("debt for personal property tax is not a consumer debt even where the property being taxed is held for personal, family, or household use.").

intentionally incur the debt or judgment, it will not be considered consumer debt for purposes of § 101(8).[70] For example, debts for personal tax liability,[71] civil torts related to the negligent operation of a vehicle,[72] emergency medical treatment,[73] an intentional tort judgment stemming from improper access to medical information,[74] monetary sanctions awarded in litigation,[75] and a breach of warranty in connection with the sale of real property,[76] have all been found to be non-consumer debt. Conversely, debts for voluntarily incurred legal fees related to a "personal, family, or household" matter, such as a divorce action, have been construed as consumer debts.[77]

The case of *In re Álvarez Vélez* is instructive.[78] In that case, the Bankruptcy Appellate Panel for the First Circuit addressed whether a debt qualified as a consumer debt in the context of the co-debtor stay under § 1301. *In re Álvarez Vélez* originated as state court litigation between neighbors, involving a petition for injunctive relief and damages against the debtor and her spouse for possession of numerous animals, excessive noise, and interference with the plaintiffs' use and enjoyment of their property, as well as an action for a declaratory judgment and injunctive relief related to discrimination and violation of federal housing statutes. By the time the debtor filed

---

[70] *In re Álvarez Vélez*, 617 B.R. at 170; *In re Peterson*, 524 B.R. at 813 (stating that although a tortious act that led to a judgment may have been undertaken voluntarily, the judgment itself was involuntarily incurred and was "not the type of debt that the Debtor would expect to incur in her daily affairs").

[71] *In re Brashers*, 216 B.R. at 59; *In re Westberry*, 215 F.3d at 589.

[72] *In re White*, 49 B.R. at 869; *In re Marshalek*, 158 B.R. at 704, *In re Alvarez*, 57 B.R. 65, 66 (Bankr. S.D. Fla. 1985) ("This Court finds that tort liability as a result of the actionable negligence of a driver causing an automobile accident is not a consumer debt.").

[73] *In re Sijan*, 611 B.R. at 856-57 (distinguishing debt for emergency medical treatment from voluntarily incurred medical treatment).

[74] *In re Peterson*, 524 B.R. at 808. *Cf. In re Izzi*, 196 B.R. 727, 731 (Bankr. E.D. Pa. 1996) (debt arising from tort liability (assault) was "clearly not a consumer debt" for purposes of § 1301).

[75] *In re Álvarez Vélez*, 617 B.R. at 172 (citing cases).

[76] *In re Gorina*, 296 B.R. 23, 27 (Bankr. C.D. Cal. 2002).

[77] *Patti v. Fred Ehrlich, PC*, 304 B.R. 182, 188 (E.D. Pa. 2003) (finding legal fees incurred for representation of co-debtor in divorce proceedings was consumer debt). !

[78] 617 B.R. 158 (1st Cir. BAP 2020).

bankruptcy, the plaintiffs held unadjudicated claims for damages and unliquidated sanctions awards of attorney's fees related to the litigation. The BAP affirmed the bankruptcy court's finding that *such debts were not consumer debts*, and therefore the co-debtor stay of § 1301 did not protect the debtor's non-filing spouse from further collection action and litigation of the plaintiffs' claims.[79]

In reaching its conclusion, the BAP noted that attorney's fees imposed by a court as a sanction do not constitute consumer debt under the Bankruptcy Code, *regardless of the nature of the action in which they were imposed*.[80] The court also found that plaintiff's claim for a potential damages award was not a consumer debt because it *had not been voluntarily incurred*, and was not the type of debt the debtor would expect to incur in her daily affairs.[81] The BAP reasoned:

> Although [debtor's] use of the Property (and her ownership of numerous animals) may have been undertaken voluntarily and for a personal or family purpose, the record does not support a conclusion that she intended to incur any debt to the [plaintiffs] arising from her use of the Property. It would be illogical to suggest that [the co-debtor] would voluntarily incur the imposition of an adverse judgment in the local court. Indeed, the litigation in that court suggests that she is resisting the entry of judgment against her. It follows, therefore, that the bankruptcy court did not err in determining that the [plaintiffs'] damages claim did not constitute consumer debt, and that the co-debtor stay of § 1301(a) did not apply.[82]

This Court finds the analysis of the BAP in *In re Álvarez Vélez* compelling. The Court need not formally adopt its holding here, but simply discusses the case to show that authority exists finding that the consumer debt inquiry under § 101(8) may turn on whether the debtor voluntarily incurred the debt primarily for a personal, family, or household purpose, and that debts arising

---

[79] *Id*. at 172.
[80] *Id.* at 171 (citing cases).
[81] *Id*. at 172 (citing *In re Peterson*, 524 B.R. at 813).
[82] *Id*. (citations omitted).

from involuntary obligations such as tort judgments and similar civil liabilities will likely fall outside that definition.

***Application***

Returning to the instant case, the issue of whether Defendant's debts to Plaintiffs or other potential claimants are consumer debts is not before the Court. Therefore, the Court has not made any effort to scrutinize each debt or make its own analysis of how Defendant should have categorized them. The only issue before the Court is whether Defendant's *characterization of her debts* in the Petition as not primarily consumer debts is objectively false, or although technically true, so misleading as to be the equivalent of a false statement.

Plaintiffs clearly believe that Defendant should have characterized her debts as primarily consumer debts, and that her failure to do so was a knowing, fraudulent, and material false oath. Plaintiffs' logic runs as follows: Defendant admits that the majority of her debt, consisting largely of contingent damages and attorney's fees involving alleged violations of the Plat covenants, is related to the Structure. Defendant admits that the Structure was erected primarily for a personal, family, or household purpose. Ergo, Plaintiffs conclude, the majority of Defendant's debt must be attributed to a personal, family, or household purpose. While the logic of Plaintiffs' argument seems sound, the legal authority for it is lacking.

As noted *supra*, although non-binding and not precedential, several courts have found that damages and attorney fees awarded in civil tort litigation do not constitute consumer debt under § 101(8).[83] Plaintiffs have cited no authority to the contrary. Besides indicating that they disagree with the way Defendant has characterized her debts as consumer or non-consumer, Plaintiffs have not provided any accounting or analysis to show which debts they believe have been improperly

[83] *See supra* notes 71-76 and accompanying text.

characterized. Nor have they presented any evidence that Defendant was attempting to mislead, deceive, or defraud any party. As such, there is simply no basis for the Court to find that Defendant's statement on her Petition that her debts are not "primarily consumer debts" is false, *much less* materially false, *much less* made knowingly and fraudulently. In the absence of finding any materially false statement made under oath, the Court finds Plaintiffs have not established a prima facie case under § 727(a)(4)(A). Therefore, no burden shifts to Defendant, and the Court need not consider any defenses she has raised.

***Section 523(a)(6)***

Lastly, Plaintiffs contend their debt should be excepted from discharge pursuant to § 523(a)(6), which provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

The United States Bankruptcy Appellate Panel of the Tenth Circuit has recently issued guidance on the interpretation of § 523(a)(6) as follows:

> [P]roof of a "willful and malicious injury" under § 523(a)(6) requires proof of two distinct elements — the injury must be both "willful" *and* "malicious."
> . . . .
> For an injury to be "willful," there must be a deliberate or intentional injury, not merely "a deliberate or intentional act that leads to injury." "[T]he (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply the act itself." A willful injury may be established by direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or by indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur. This is a subjective standard.
> . . . .
> For an injury to be "malicious," "evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present." "[A]ll the surrounding

> circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor." A willful and malicious injury requires more than negligence or recklessness. Six circuit courts have defined the "malicious" element to require an act taken in conscious disregard of one's duties and without just cause or excuse, even in the absence of personal hatred, spite or ill-will, or wrongful and without just cause or excuse. These definitions are similar to the pre-*Geiger* definition of "malicious" adopted by the Tenth Circuit in *In re Pasek*. . . . For an injury to be "malicious," therefore, the debtor's actions must be wrongful.[84]

In order for conduct to be willful under § 523(a)(6), "the debtor must desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it."[85] This can include a "deliberate or intentional invasion of the legal rights of another, because the word 'injury' usually connotes legal injury (*injuria*) in the technical sense[.]"[86] A court's determination under § 523(a)(6) requires a subjective assessment of the debtor's knowledge and motives, including any claimed justification or excuse.[87] "The subjective standard

---

[84] *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912, 919 (10th Cir. BAP 2020) (citations omitted). *See also Kawaauhau v. Geiger*, 523 U.S. 57 (1998); *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524 (10th Cir. 1993) (adopting separate standards for "willful" and "malicious" under § 523(a)(6)); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, No. 22-1005, 2022 WL 2679049, at *7 (10th Cir. July 12, 2022) (unpublished) (adopting analysis of *In re Smith*, 618 B.R. at 919); *Swan Pediatric Dental, LLC v. Hulse (In re Hulse)*, No. 22-001, 2022 WL 16826561, at *7–8 (10th Cir. BAP Nov. 8, 2022) (citing *In re Smith*, 618 B.R. at 912).

[85] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (quoting *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999)).

[86] *In re Geiger*, 113 F.3d 848 (8th Cir. 1997), *aff'd sub nom. Kawaauhau v. Geiger*, 523 U.S. at 57.

[87] *In re Pasek*, 983 F.2d at 1527; *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146 (9th Cir. 2002); *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995) ("[I]t is the debtor's subjective state of mind that is relevant; it does not matter that a 'reasonable debtor' should have known that his act would adversely affect another's rights."); *In re Smith*, 618 B.R. at 919; *Baner v. Charles (In re Charles)*, No. 17-12568, 2023 WL 3066684, at *8 (Bankr. D. Nev. Apr. 24, 2023) ("Section 523(a)(6)'s willful injury requirement is met 'only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct.'" (quoting *In re Su*, 290 F.3d at 1142)).

correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain."[88] Debts arising from recklessly or negligently inflicted injuries are not covered by § 523(a)(6).[89] In conducting such an inquiry, a court is not limited to self-serving statements from the debtor; "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."[90] "A totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses."[91]

In the Tenth Circuit, "malicious intent [may] be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights."[92] A debtor's actions must have been wrongful and done without just cause or excuse, i.e., constructive or implied malice.[93] Personal animus, personal hatred, spite or ill-will, i.e., express malice, is not required.[94] Maliciousness will be found by imputation

---

[88] *In re Su*, 290 F.3d at 1146. *See also In re Charles*, 2023 WL 3066684, at *11 ("[E]ven substantial certainty of injury under § 523(a)(6) remains dependent upon the debtor's subjective belief. In *Su*, the Ninth Circuit rejected the objective application of substantial certainty of harm to prove willfulness under § 523(a)(6).").

[89] *Geiger*, 523 U.S. at 64; *In re Smith*, 618 B.R. at 913.

[90] *In re Su*, 290 F.3d at 1146 n.6. *See also Tobias v. Alvarado (In re Alvarado)*, 608 B.R. 877, 885 (Bankr. W.D. Okla. 2019) ("Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances." (citations omitted)).

[91] *Graham v. Graham (In re Graham)*, 600 B.R. 90, 95-96 (Bankr. D. Kan. 2019).

[92] *In re Pasek*, 983 F.2d at 1527 (internal quotation marks and citation omitted).

[93] *In re Smith*, 618 B.R. at 919 n.116 (citing *Murphy v. Snyder (In re Snyder)*, 939 F.3d 92, 105 (2d Cir. 2019)). *See also Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) ("This element can be satisfied by either actual or constructive malice.").

[94] *In re Bloom*, 2022 WL 2679049, at *7 (citing *In re Smith*, 618 B.R. at 919). *See also Park v. Sec. Bank & Tr. Co.*, 1973 OK 72, 512 P.2d 113 (distinguishing express from implied malice); *In re Snyder*, 939 F.3d at 105 (citing *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)); *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1294 (11th Cir. 2014); *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st

> where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and, most important, and under some aggravating circumstance such as to warrant denial of discharge.[95]

For an injury to be malicious, the debtor must be *conscious* that their actions are wrongful.[96]

Courts have found that under certain circumstances, sanctions for violating court orders may be non-dischargeable under § 523(a)(6).[97] In order for a monetary sanction to be excepted from discharge, the conduct that resulted in the sanction must have been "willful" and "malicious" as those terms are construed for the purpose of § 523(a)(6). Mere failure to comply with a court order is not sufficient, as a debtor may have some justification or excuse, or the debtor may have been negligent or inattentive, or the debtor may not have intended to harm the creditor.[98] Under Oklahoma law, violation of an injunction or restraining order issued, either for protection of or enforcement of a private right, constitutes an "indirect contempt" of court.[99] Indirect contempt of court is defined as: "willful disobedience of any process or order lawfully issued or made by court; resistance willfully offered by any person to the execution of a lawful order or process of a

---

Cir. 2013); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994); *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).

[95] *Bundy Am. Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 144 (Bankr. S.D.N.Y. 1998). *See also In re Hambley*, 329 B.R. at 402.

[96] *In re Bloom*, 2022 WL 2679049, at *7 (citing *In re Smith*, 618 B.R. at 919); *In re Levasseur*, 737 F.3d at 818 ("The injury must have been committed in 'conscious disregard of one's duties.'"); *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) ("[A] debtor's actions are not automatically labeled malicious simply because they are wrongful. There must also be a consciousness of wrongdoing. It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6). Without it there can be no 'conscious disregard of one's duties,' only an unconscious one." (citations omitted)).

[97] *Moses v. Seeberger (In re Seeberger)*, No. 10-11858, 2011 WL 6749049, at *22 (Bankr. N.D. Okla. Dec. 22, 2011); *In re Suarez*, 400 B.R. 732 (9th Cir BAP. 2009); *Liddell v. Peckham (In re Peckham)*, 442 B.R. 62 (Bankr. D. Mass. 2010).

[98] *In re Seeberger*, 2011 WL 6749049, at *22 n.170.

[99] *Malnar v. Whitfield*, 1989 Okla. Civ. App. 28, 774 P.2d 1075.

court."[100]

***Application***

Plaintiffs' contempt charges against Defendant have not been adjudicated in the State Court Action. While this Court does not have jurisdiction to litigate the issue of contempt for violation of the State Court orders,[101] it does have the authority to determine if, as a factual matter, a violation of any State Court order occurred, and if so, whether Defendant committed the violation willfully and maliciously—that is without just cause or excuse and knowing or intending that the violations would harm Plaintiffs.

We begin with the language of the State Court TRO and Temporary Injunction. An injunction, by definition, is "a command to refrain from a particular act."[102] The TRO ordered that Defendant and her agents were temporarily enjoined from "performing any further construction on" the Structure, including "the installation of any electrical or plumbing fixtures or materials in or on" the Structure, and from "allowing any person . . . to occupy" the Structure.[103] The Temporary Injunction enjoined Defendant and her agents from "any further construction" on the Structure, and from "allowing any person to occupy" the Structure.[104]

Plaintiffs alleged several violations of the TRO and/or Temporary Injunction, but most are without evidentiary support. Two actions, both admitted by Defendant, warrant discussion. While not directly admitting to violation of the TRO or Temporary Injunction, Defendant admits that 1) she either explicitly or implicitly allowed Mr. Rick and other contractors to secure the building

---

[100] Okla. Stat. tit. 21, § 565. *See also Seifried v. State ex rel. Bash*, 1939 OK 28, 86 P.2d 1008, 1010; *Blanton v. State*, 31 Okla. Crim. 419, 239 P. 698 (1925).

[101] *See Cooper v. Cooper*,1980 OK 128, 616 P.2d 1154, 1156 (contempt proceedings triable only by court against whose authority contempt is charged).

[102] Okla. Stat. tit. 12, § 1381.

[103] Defendant's Ex. 117.

[104] ECF No. 25-2. *See supra* note 9.

site after she became aware of the TRO; and 2) she allowed Mr. Rick and other contractors to resume construction on the downstairs portion of the Structure after she received the Erroneous Order. Because of the posture of this matter, the Court need not, and will not, make any legal finding about whether such actions constitute a violation of either the TRO or the Temporary Injunction, nor will it determine whether Defendant violated any legal right of Plaintiffs. Such a finding is simply not necessary here because, even if the Court were to find such injury, there has been no showing that any action of Defendant rises to the level of malicious injury under § 523(a)(6).

With respect to the alleged violation of the TRO, both Defendant and Mr. Rick testified regarding their actions and motivations after they were informed that no further construction on the Structure was allowed. Mr. Rick testified that upon becoming aware of the TRO, his crew picked up their tools and left for the day. An entry door to the Structure had been installed incorrectly, and a carpenter returned to the Structure to correct the installation for the sole purpose of making sure the door could be locked. Additionally, a garage door to the Structure had been installed without a seal, and a contractor returned to the Structure to add the missing seal. Both actions were specifically taken to secure the Structure and the materials inside. Mr. Rick also testified that his crew filled in an open ditch on Defendant's Property surrounding the Structure that held water lines and conduit, in order to make the premises safe. In addition, Mr. Rick described a situation where a contractor returned to the Structure without authorization from him or Defendant and installed a meter box and power head. The motivation of the contractor appears to be a wish to be paid for his work, which would not have happened if it was left undone.[105] Defendant testified that, although she asked Mr. Rick and his crew to stop work immediately, she

[105] Plaintiffs' Ex. 26, at 2 ¶ 9.

took responsibility for allowing them to secure the Structure and materials, and to take necessary measures to ensure the safety of the premises.

With respect to the alleged violation of the Temporary Injunction, Defendant admits that in September 2023, after being informed of the Erroneous Order, she authorized Mr. Rick to resume work on the downstairs portion of the Structure, in compliance with its terms. Defendant credibly testified that she had no reason to question the legitimacy of the Erroneous Order, especially because it was consistent with requests made by her counsel in the Second Application to the State Court. Despite Plaintiffs' allegations that Defendant "must" have known that the Erroneous Order was invalid, they presented no evidence of that fact. Both Defendant and Mr. Rick testified that they ceased work immediately upon learning of the invalidity of the Erroneous Order.

The Court finds that it need not make any finding regarding whether Defendant caused Plaintiffs injury as a result of her actions because Plaintiffs have not met their burden to show by a preponderance of evidence that any action of Defendant was made in a malicious manner. From Defendant's demeanor and testimony, the Court believes she made sincere efforts to comply with both the letter and spirit of the TRO and Temporary Injunction. Although Defendant admits that she at times put the security and safety of her home and family above the technical words of the State Court orders, there was no evidence that she took a cavalier attitude towards her obligations thereunder, that she sought to gain any sort of advantage in the State Court Litigation, or that she purposely chose to drive up Plaintiffs' litigation costs. To the extent that any action by Defendant can be seen as wrongful (which this Court is explicitly not finding), she has presented sufficient justification for each such action. Under the totality of the circumstances, Plaintiffs have not met their burden to show they hold a nondischargeable debt under § 523(a)(6).

## Conclusion

A discharge in bankruptcy is reserved for the honest but unfortunate debtor.[106] Despite Plaintiffs' overwhelming attempts to prove otherwise, the Court found Defendant to be honest and forthcoming in her dealings with both Plaintiffs and the Court. The Court found no evidence that Defendant attempted to intentionally move assets to the detriment of Plaintiffs. Nor did the Court find any evidence Defendant attempted to hide or conceal assets, or to mislead the Court or creditors through misrepresentations in her Petition. Likewise, "[e]xceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[107] The Court found no evidence that Defendant willfully and maliciously violated court orders to gain advantage in the State Court Litigation. To the contrary, the Court found Defendant was conscientious and careful to obey orders, while being cognizant of the practical realities of safety and security on a modern construction site. Far from being willful and malicious, the Court found Debtor's behavior to be considered and reasonable.

Defendant shall be granted a discharge in Case No. 24-10239-T. Plaintiffs' claims against Defendant are dischargeable in the bankruptcy case. A separate judgment consistent with this Memorandum Opinion shall be issued concurrently herewith.

###

---

[106] *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("[I]n the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'").

[107] *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval)*, 541 F.3d 997 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358 (10th Cir. 1997)).